## In re the Honorable Robert FRANCIS, Relator.

### No. 06–0040.

Supreme Court of Texas.

Argued Jan. 24, 2006.

Decided Jan. 27, 2006.

Doug W. Ray, Randall Buck Wood, Ray Wood & Bonilla, L.L.P., Austin, Deborah G. Hankinson, Rick Thompson, Law Offices of Deborah Hankinson PC, Dallas, for Relator.

Patrick O. Keel, Larry F. York, York Keller & Field, L.L.P., Edward M. Shack, Donna G. Davidson, Margaret A. Wilson, Frank Reilly, Michael C. Crowley, Potts & Reilly, L.L.P., Austin, for Real Party.

Justice BRISTER delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice HECHT, Justice MEDINA and Justice GREEN joined.

With the arrival of the biennial primary season, we must address once again whether the Texas Election Code requires minor defects in a candidate's papers to be addressed by eliminating the error or the candidate.[1] In this case, a candidate for the Texas Court of Criminal Appeals filed a 225–page petition signed by hundreds of eligible voters, more than enough to have his name placed on the Republican primary ballot. But due to a clerical error, several pages did not state that he was running for "Place 8" on that Court. The Republican Party of Texas listed him as a candidate, but his name was removed by a Travis County district judge upon challenge by another Republican candidate.

 Candidates have a duty to file applications for office that comply with the Texas Election Code. But the ballot is not restricted to those who never make a mistake. To the contrary, the Election Code anticipates that candidates will occasionally err and specifically requires party officials to assist them so that no candidate is excluded from the ballot unnecessarily. When a defect could have easily been cured had party officials properly performed their statutory role, nothing in the Code requires exclusion as a mandatory remedy. We hold that the trial court erred in concluding that it does.

## I

Candidates for statewide judicial office in Texas must file an application accompanied by a petition with signatures of at least 50 eligible voters from each of the State's 14 appellate districts.[2] The following statement must appear at the top of each page of the petition:

> I know that the purpose of this petition is to entitle (insert candidate's name) to have his or her name placed on the ballot for the office of (insert office title, including any place number or other distinguishing number) for the (insert political party's name) primary election. I understand that by signing this petition I become ineligible to vote in a primary election or participate in a convention of another party, including a party not holding a primary election, during the voting year in which this

---

1. See In re Bell, 91 S.W.3d 784 (Tex.2002); In re Gamble, 71 S.W.3d 313 (Tex.2002).

2. See TEX. ELEC. CODE § 172.021(g); cf. TEX. ELEC. CODE § 181 et. seq. (providing separate procedures for political parties making nominations by convention).

primary election is held.[3]

On December 29, 2005—four days before the January 2nd filing deadline [4]—Relator Robert Francis, currently Judge of the Dallas County Criminal District Court No. 3, filed his application and an accompanying petition as a candidate for the Texas Court of Criminal Appeals. His application and 198 pages of his petition noted that he sought election to Place 8 on that Court. An additional 27 pages of his petition listed the same court, but omitted the place number. Because he had obtained far more signatures than the statutory minimum, 15 of the defective pages were superfluous. But 12 of the errant pages were concentrated in one appellate district, leaving 95 of his 122 signatures from that district on pages without a place number.

Republican and Democratic candidates for statewide judicial office must file their applications and petitions with the "state chair" of the party in whose primary they choose to run.[5] After filing, state law provides that the state chair "shall review" an application and accompanying petition to determine whether they comply with statutory requirements "as to form, content, and procedure."[6] Further, that review "shall be completed as soon as practicable,"[7] or "not later than the fifth day" if the application does not include a petition.[8] If the documents do not comply with the statutory requirements, the state chair "shall reject the application and immediately deliver to the candidate written notice of the reason for the rejection."[9]

In this case, Francis personally delivered his application and petition to the office of the Chair of the Republican Party of Texas. The State Chair's appointee assured Francis that the Party would review the documents before the January 2nd filing deadline. On December 30, the Party completed its review and notified Francis that his filings were in order and his name

---

3. *Id.* § 172.027 (underlining in original).

4. *See id.* § 172.023(a).

5. *Id.* § 172.022(a)(1).

6. *Id.* § 141.032(a), (c). The full text of this section reads:

§ 141.032. REVIEW OF APPLICATION; NOTICE TO CANDIDATE.

(a) On the filing of an application for a place on the ballot, the authority with whom the application is filed shall review the application to determine whether it complies with the requirements as to form, content, and procedure that it must satisfy for the candidate's name to be placed on the ballot.

(b) Except as provided by Subsection (c), the review shall be completed not later than the fifth day after the date the application is received by the authority.

(c) If an application is accompanied by a petition, the petition is considered part of the application, and the review shall be completed as soon as practicable after the date the application is received by the authority. However, the petition is not considered part of the application for purposes of determining compliance with the requirements applicable to each document, and a deficiency in the requirements for one document may not be remedied by the contents of the other document.

(d) A determination under this section that an application complies with the applicable requirements does not preclude a subsequent determination that the application does not comply, subject to Section 141.034.

(e) If an application does not comply with the applicable requirements, the authority shall reject the application and immediately deliver to the candidate written notice of the reason for the rejection.

(f) This section does not apply to a determination of a candidate's eligibility.

7. *Id.* § 141.032(c).

8. *Id.* § 141.032(b).

9. *Id.* § 141.032(e).

would be posted as a candidate by the end of the day—which it was.

Three days later, and thirty minutes before the filing deadline, an attorney for another candidate notified Party officials about the omission of "Place 8" from several pages of Francis's petition. On Friday, January 6, 2006, the Party Chair rejected this challenge and certified Francis as a candidate.[10]

On Monday, January 9, Travis County District Judge John Dietz reversed that ruling, signing a temporary injunction that ordered the Republican Party to "decertify" Francis and enjoined the Party from listing him as a candidate. On January 11, Francis filed an interlocutory appeal, and the next day, Francis also filed an emergency petition for writ of mandamus in the court of appeals. On January 13, the court of appeals denied Francis's petition for writ of mandamus. That same day, Francis filed this emergency petition for writ of mandamus, asking this Court to order the trial court to vacate its temporary injunction, and to order the Republican Party Chair to put Francis's name on the primary ballot. The interlocutory appeal of the temporary injunction remains pending in the court of appeals.

This Court may review a temporary injunction from a petition for writ of mandamus when an expedited appeal would be inadequate; if, for example, the appeal could not be completed before the issue became moot.[11] In addition, Section 273.061 of the Texas Election Code gives the Court jurisdiction to issue a writ of mandamus to compel the performance of any duty imposed by law in connection with the holding of an election.[12] In a mandamus action, this Court reviews the trial court's actions to determine whether it clearly abused its discretion.[13] A trial court has no discretion to determine what the law is.[14]

## II

There is no disagreement about the material facts.

First, the record establishes that Francis's application and petition complied in all respects with all statutory requirements, except that 27 pages of his 225-page petition lacked one requirement—the designation of a place number.

Second, the State Chair's appointee testified that she reviewed Francis's petition, but failed to discover the occasional omission of "Place 8." Significantly, there are

**10.** *See id.* § 172.028.

**11.** *See Republican Party of Texas v. Dietz*, 940 S.W.2d 86 (Tex.1997) (party entitled to challenge trial court's temporary injunction by mandamus in Supreme Court); *Sears v. Bayoud*, 786 S.W.2d 248 (1990) (Supreme Court mandamus review available for election mandamus based on its "statewide application," "urgency of time constraints," and potential for the case to become moot without immediate attention); *see also In re Newton*, 146 S.W.3d 648, 652–53 (Tex.2004) (holding that mandamus was available because a temporary restraining order is generally not appealable, and the impending election would have concluded before any appeal from the trial court's ruling was possible); *In re Texas Natu-*

*ral Res. Conservation Comm'n*, 85 S.W.3d 201, 207 (Tex.2002) (holding ·that "mandamus is available to remedy a temporary restraining order that violates Rule 680's time limitations").

**12.** TEX. ELEC. CODE § 273.061; *Sears*, 786 S.W.2d at 249. *See also Sterling v. Ferguson*, 122 Tex. 122, 53 S.W.2d 753, 758 (noting that mandamus cannot issue to compel election officials to take action while still under the constraints of an existing injunction).

**13.** *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135–36 (Tex.2004).

**14.** *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex.1992).

three seats on the Court of Criminal Appeals up for election this year.

Third, Francis proved that, had his petition been rejected for this defect on December 30th rather than approved, he could have cured it before the filing deadline. Within 24 hours after service of his opponent's temporary injunction pleadings, Francis filed new petitions in the trial court that included the place designation, signed by most of the same voters who signed the original defective ones.

Based on this undisputed evidence, the trial court concluded that any omission of the statutory requirements for a petition rendered all signatures on that page invalid, that such errors could not be cured even if the State Chair had approved the petitions, and that Francis could not be certified as a candidate. We agree with the first legal conclusion, but disagree with the others.

### A

■ We agree that the omission of any statutorily required information on a petition renders signatures on that petition invalid.[15] Section 172.027 of the Election Code says that a candidate's place number "must appear at the top of each page of a petition." Section 141.063(a)(4) says that a signature on a petition is invalid unless "each statement that is required by this code ... appears, at the time of signing, on the page on which the signature is entered." As the Code requires a place number on each page, and declares invalid any signatures on pages without it, the trial court correctly concluded that all but 27 signatures from the district involved in this challenge are invalid.

### B

We disagree, however, that invalid signatures cannot be cured. The Election Code never explicitly says what happens when a state chair erroneously approves a petition containing invalid signatures, but discovers the error later. As with other statutes, "the consequence of noncompliance is not necessarily punishment."[16]

In primary elections, statewide judicial candidates are certified for the ballot by the party's state chair.[17] Section 172.028(c) provides that a candidate's name "may not be certified" by the party chair if the candidate has filed for more than one office,[18] or if a candidate withdraws, dies, or is "declared ineligible."[19] But the Code never says that a candidate *must* be declared ineligible when petition signatures are invalid. To the contrary, while party chairs should reject such a petition,[20] if it

15. We have strictly enforced mandatory statutory requirements for political candidacy in the past. *See, e.g., Wallace v. Howell,* 707 S.W.2d 876, 877 (Tex.1986) (disqualifying candidate who filed application for two judicial positions and conditioned withdrawal from one on qualification for the other); *Painter v. Shaner,* 667 S.W.2d 123, 125 (Tex. 1984) (noting "statutory mandates" should be "strictly construed"); *Brown v. Walker,* 377 S.W.2d 630, 632 (Tex.1964) (disqualifying candidate who mailed application by regular mail because applications sent before, but received after, the deadline must be sent via certified or registered mail); *Canady v. Democratic Executive Comm. of Travis County,* 381 S.W.2d 321, 324 (Tex.1964) (disqualifying candidate who listed his legal address as one outside the relevant precinct); *Burroughs v. Lyles,* 142 Tex. 704, 181 S.W.2d 570, 573 (1944).

16. *Hines v. Hash,* 843 S.W.2d 464, 469 (Tex. 1993).

17. TEX. ELEC. CODE § 172.028(a).

18. *Id.* § 141.033.

19. *Id.* § 172.057.

20. *Id.* § 141.032(e).

is erroneously accepted, it cannot be challenged once early voting begins.[21]

This is not the only statute that says something "must" be done, but does not say what happens if it is not. This Court has considered several such statutes,[22] as has the United States Supreme Court.[23] In *Hines v. Hash*, for example, we addressed the pre-suit notice requirement in the Texas Deceptive Trade Practices Act, which was added to the statute in 1977, and from which the statutory penalty (loss of treble damages) was removed two years later.[24] We held the pre-suit notice requirement was "clearly mandatory, but that feature alone does not determine the consequences for failure to comply with it."[25] Instead, we stated that when a statute is silent as to a penalty, we must look to the statute's purpose for guidance.[26] As the purpose of the DTPA's notice provision was to "discourage litigation and encourage settlements,"[27] that purpose was served not by tossing noncomplying consumers out of court, but by abating the suit to allow settlement negotiations to occur.[28]

We think the same analysis requires the same type of abatement here. Four years ago, we stated in *In re Gamble* that the primary purposes of the Election Code provisions at issue here were to (1) ensure that candidates are properly qualified and (2) provide a safety net for their errors:

> While section 141.032 is indisputably designed to assure that candidates are properly qualified to be nominated as a party's candidate for the general election, that is not the only reason for the provision. This section also serves as a safety net for candidates who file their applications early in the filing period, assuring that individuals willing to commit to public service will receive the assistance of party officials in complying with the myriad and technical requirements for becoming a party candidate. There would be no purpose to the duty to notify the prospective candidate of defects in his or her application if the intent was not to allow an opportunity to cure those defects, particularly if the defects can be corrected before the filing

21. *Id.* § 141.034(a).

22. *See e.g., Hubenak v. San Jacinto Gas Transmission Co.*, 141 S.W.3d 172, 184 (Tex.2004) (determining consequences of condemning authority's failure to negotiate land price as statutorily mandated); *Lubbock County v. Trammel's Lubbock Bail Bonds*, 80 S.W.3d 580, 584 (Tex.2002) (determining that consequences of following mandatory procedure is abatement until procedure is followed); *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 494 (Tex.2001) ("When a statute is silent about the consequences of noncompliance, we look to the statute's purpose to determine the proper consequences.") (quoting *Albertson's, Inc. v. Sinclair*, 984 S.W.2d 958, 961 (Tex.1999) and determining consequence of failure to submit claim to arbitration within statutory period); *State v. $435,000*, 842 S.W.2d 642, 644 (Tex. 1992) (per curiam) (holding that dismissal is not a consequence of State's mandatory duty to hold forfeiture hearing within the pre-

scribed time); *Schepps v. Presbyterian Hosp. of Dallas*, 652 S.W.2d 934, 938 (Tex.1983) (determining that the purpose of the mandatory notice requirement was better served by abating cause of action to allow intended negotiations rather than terminating plaintiff's substantive rights).

23. *See Brock v. Pierce County*, 476 U.S. 253, 259–62, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986).

24. *See Hines*, 843 S.W.2d at 466–67.

25. *Id.* at 467.

26. *Id.* at 468.

27. *Id.* at 468 (quoting *Jim Walter Homes, Inc. v. Valencia*, 690 S.W.2d 239, 242 (Tex.1985)).

28. *Id.* at 469.

deadline.[29]

As we noted in *Gamble*, it is hard to see why the Election Code requires this review procedure unless the purpose is to avoid disqualifying candidates for clerical errors. Similarly, it is hard to see why the statute requires review "as soon as practicable" and that notice of defects be given "immediately" unless the Legislature intended to give candidates who file early an opportunity to remedy defects while there is still time. These statutory purposes are defeated if a party chair fails to conduct any review, fails to discover defects apparent on the face of the filing documents, or fails to notify candidates of defects observed while there is still time to correct them. A limited opportunity to cure would remedy such statutory omissions.

Abatement and cure would also advance the purposes of the Election Code by encouraging candidates to use it as a tool rather than a trap. Candidates would be encouraged to file early so that they can benefit from the state chair's review, and ensure that they will not be excluded for technicalities. Opponents would no longer be able to win elections by default by pointing out defects only after it is too late to correct them. Nor would abatement "penalize" those who strive to file perfect papers; they will share the same benefits when they fall short, and at worst will only be required to win election on their own merits. The result should be a system in which there are fewer technical errors and fewer elections decided by default—a result truly consistent with the Code.

Further, it would be inconsistent with the purposes of the Code if some candidates but not others get an opportunity to cure defects. If a party chair happens to discover a defect in one petition but overlooks the same defect in another, an element of chance is introduced into the primary process. The review procedure itself indicates that the Legislature did not intend to create such a whimsical form of democracy.

As we noted in *Gamble*, candidates must bear ultimate responsibility for filing a proper application and petition.[30] But the Election Code expressly requires that party chairs assist candidates with "the myriad and technical requirements" governing those documents.[31] The party chair's duty is not conditioned on whether candidates comply with theirs; on the contrary, the party chair's duty only makes a difference when a candidate's efforts have fallen short. These procedures are simply inconsistent with holding that the Legislature intended to punish candidates for clerical errors by excluding them from the ballot.

■ Accordingly, as we did with the DTPA, we hold that when a challenge is made based on facial defects a party chair overlooked and approved when they could have been cured, the trial court must abate the challenge and allow the candidate that opportunity. Candidates should have the same opportunity to cure as a proper review before the filing deadline would have allowed them.[32] Consistent with the purposes of the Election Code and *Gamble*, facial defects should exclude a candidate from the ballot only when a proper review by the party chair would have led to the same result.

## C

For many reasons, an abatement and opportunity to cure not only complies best

---

29. 71 S.W.3d at 318.

30. *Id.* at 317–18.

31. *Id.*

32. Of course, such relief is constrained by the election schedule itself, as courts generally should not delay an election. *See id.* at 318.

with the purposes of the Election Code, but is also the fairest remedy, and the one most likely to cause the least harm. First, access to the ballot lies at the very heart of a constitutional republic. "The Constitution requires that access to the electorate be real, not 'merely theoretical.'"[33] As we have noted many times in recent years, provisions that restrict the right to hold office must be strictly construed against ineligibility.[34] Construing the Election Code's silence in favor of an opportunity to cure avoids potential constitutional problems that might be implicated if access to the ballot was unnecessarily restricted.

Second, abatement ensures that the punishment fits the crime. When a petition does not contain all the required information, there is a potential for voter confusion or fraud. But certainly that is not always the case; sometimes voters know precisely what they are doing even if a clerical error might have misled someone else. Requiring that errors be cured separates the two cases—candidates who can get on the ballot without misleading voters will be able to cure, while those who must mislead voters to do so will not. Punishing every minor error as if it were a case of confusion or fraud not only punishes some candidates too much, but also frustrates the intentions of many voters who willingly signed their petitions.

Third, it places the duty of a party chair in its proper role. Party chairs are not required to be lawyers, nor are they required to be perfect. They have a very limited time to review thousands of papers during the window in which they must be filed. In such circumstances, they do not need the added burden that their own minor mistakes (when looking for the minor mistakes of others) might destroy a candidate's public career. Moreover, by allowing party chairs to focus on facial defects and call for correction before the filing deadline, the party chair is required neither to guess which defects render a petition invalid, nor what a court might do about them if they are challenged.

Fourth, this remedy advances the interests of those in whose name elections are conducted—the people. The public interest is best served when public offices are decided by fair and vigorous elections, not technicalities leading to default. Beginning every election cycle with lawsuits and publicity about efforts to toss candidates off and on the ballot sends an unfortunate message that elections are more about civic entertainment than civic duty.

Finally, we emphasize several limitations on today's holding. First, it concerns only facial defects that are apparent from the four corners of a candidate's filings; it does not reach forgery, fraud, or other non-accidental defects discoverable only by independent investigation. Second, it concerns only early filings that allow time for corrections after the state chair's review; no additional time will be available for candidates who file at the last minute so that review cannot be completed before the filing deadline. Third, it does not allow political parties or candidates to ignore statutory deadlines; it allows candi-

---

**33.** *Am. Party of Texas v. White,* 415 U.S. 767, 783, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974).

**34.** *E.g., In re Carlisle,* —— S.W.3d ——, ——, 49 Tex. Sup.Ct. J. 262, —— (Tex.2006) (per curiam); *State v. Hodges,* 92 S.W.3d 489, 494–95 (Tex.2002); *Davis v. Taylor,* 930 S.W.2d 581, 583 (Tex.1996); *Wentworth v. Meyer,* 839 S.W.2d 766, 767 (Tex.1992); *Daw-*

*kins v. Meyer,* 825 S.W.2d 444, 448 (Tex. 1992); *Sears v. Bayoud,* 786 S.W.2d 248, 251 (Tex.1990); *Brown v. Meyer,* 787 S.W.2d 42, 45 (Tex.1990); *Hall v. Baum,* 452 S.W.2d 699, 702 (Tex.1970), *appeal dismissed,* 397 U.S. 93, 90 S.Ct. 818, 25 L.Ed.2d 79 (1970); *Willis v. Potts,* 377 S.W.2d 622, 623 (Tex. 1964).

dates only the time that the Election Code was designed to give them. Fourth, it concerns only defective filings that have erroneously been approved; it does not change what the Election Code says party chairs should and must reject. Finally, it does not absolve candidates of the need for diligence and responsibility in their filings; party chairs must only notify them of defects, not do their work for them.

## III

■ Applying these standards to the undisputed facts here, we hold that the trial court erred in concluding that the Election Code mandated the temporary injunction. While Francis's petition contained invalid signatures, he proved that he could have replaced them within 24 hours. Francis did not do so before the filing deadline only because the Party Chair (like he himself) inadvertently overlooked them. For the reasons above, we hold that the Election Code does not provide that he must be excluded from the ballot as a penalty.

When a candidate has been denied a place on the ballot due to official error, we have generally granted mandamus relief.[35] Accordingly, we conditionally grant the writ of mandamus and direct the trial court to vacate its order that Francis be excluded from the 2006 Republican Party primary ballot as a candidate for the Texas Court of Criminal Appeals, Place 8. The trial court is directed to abate the underlying proceeding to allow Francis to cure the defect. We are confident that the trial court will promptly comply, and our writ will issue only if it does not.

Justice WAINWRIGHT filed a dissenting opinion, in which Justice O'NEILL and Justice JOHNSON joined.

Justice WILLETT did not participate in the decision.

Justice WAINWRIGHT, joined by Justice O'NEILL and Justice JOHNSON, dissenting.

Today the Court creates a period, that can extend beyond the statutory filing deadline, during which candidates can cure disqualifying defects in their petitions to be certified to run for public office. The Legislature did not enact a cure period in the Texas Election Code. Because the Court does, I respectfully dissent.

The Court's opinion dramatically changes the law. Two fundamental differences separate this dissent from the Court's opinion. First, should the Legislature or the courts construct a cure period in a statute that includes none? I believe it is the Legislature's province, especially when the legislative decision not to include a cure period was part of an intricate statutory scheme governing the process of electing candidates to public office. The Court's opinion extends the election certification deadline for any candidate who seeks to cure petition defects and risks disruption of the legislated scheme for the election of public officials. Second, the Election Code makes the candidate responsible for timely filing a proper application and petition to be certified as a candidate. Before today, our opinions emphasized that this obligation ultimately rests on the candidate. Now the candidate may, but need not, file a compliant application by the filing deadline because if the party chair does not catch the error, the candidate has a right to cure it after the deadline. Not only does this elevate the party chair's role in the election process beyond the Legislature's intent, it undercuts the responsibility of the candidate to ensure that he or she timely files a petition for judicial office that complies with the law.

---

**35.** *See Davis v. Taylor,* 930 S.W.2d 581, 583 (Tex.1996).

The Election Code and our precedents establish a framework for construing the relevant statutory requirements in a manner that comports with its language and furthers the purpose of the Election Code. I would follow the statute and apply our precedents to resolve this case.

## I. Factual and Procedural Background

On December 29, 2005, Judge Robert Francis filed an application, including a petition, for a place on the Republican Party general primary ballot as a candidate for Place 8 on the Texas Court of Criminal Appeals. The Election Code requires candidates for positions on the Court of Criminal Appeals to include, as part of their application for a place on the primary ballot, a petition with fifty valid signatures of registered voters in each court of appeals district, for a total of 700 signatures. Francis's petition consisted of 225 signature pages, including seventeen pages containing at least one signature of a registered voter from the Twelfth Court of Appeals District. Of those seventeen pages, which contained 122 signatures, twelve pages did not reference the place number on the Court of Criminal Appeals for which Francis sought to be a candidate. Only twenty-seven signatures appeared on pages with the "Place 8" designation. Three separate places on the Court of Criminal Appeals are on the ballot this election cycle.

Representative Terry Keel, seeking to be on the Republican Party primary ballot for the same position, filed his application and petition on December 27, 2005. On Friday, December 30, 2005, Keel reviewed Francis's and incumbent Judge Charles Holcomb's applications and petitions at the Republican Party's office. Keel discovered the omission of the place number on the twelve pages from the Twelfth Court of Appeals District and made copies of Francis's application and petition. On the same day, Sarah Floerke, the Texas Republican Party Elections Administrator, told Francis that his application and petition had been reviewed and approved. By the end of the business day, Francis was listed as a candidate for Place 8 of the Court of Criminal Appeals on the Republican Party's website. The deadline for candidates to file their applications and petitions was 6:00 p.m., Monday, January 2, 2006.

Over the weekend, Keel met with his attorney to discuss the defects. At 5:30 p.m. on January 2, Keel's attorney delivered a letter to the Republican Party chair, Tina Benkiser, challenging the certification of Francis's placement on the general primary ballot based on the omission of the place number on some of the signature pages in Francis's petition. After 5:00 p.m. on Friday, January 6, 2006, a Party official told Keel that Francis would be certified as a candidate despite Keel's objection.

On Saturday, January 7, 2006, Keel requested a temporary restraining order to prevent Benkiser from certifying Francis as a candidate. The trial court denied the request and set Keel's application for a temporary injunction for a hearing on Monday, January 9, 2006. Francis intervened and filed a cross claim. Keel, Benkiser, and Francis appeared at Monday's hearing, and the trial court heard testimony from Francis and Floerke. At the conclusion of the hearing, the trial court entered a temporary injunction that enjoined Benkiser from certifying Francis as a candidate, ordered Benkiser to decertify Francis to the extent he was already certified, and enjoined Benkiser from placing Francis's name on the Republican Party primary ballot. The next day the court heard argument and additional testimony from Francis, Floerke, and Keel's attorney

before denying Francis's motion to reconsider the temporary injunction. The trial court set the case for trial on February 3, 2006.

On January 11, 2006, Francis filed a notice of appeal in the trial court and in the court of appeals, along with an emergency motion to stay the trial court's temporary injunction. On January 12, 2006, Francis also filed an emergency petition for writ of mandamus in the court of appeals. On January 13, the court of appeals denied Francis's motion to stay and his petition for writ of mandamus. On the same day, Francis filed this petition for writ of mandamus, asking this Court to order the trial court to vacate its temporary injunction. In his supplemental petition filed with this Court, Francis also requests the Court to order the Republican Party chair to take all steps necessary to put Francis's name on the Republican Party primary ballot. The appeal of the temporary injunction remains pending in the court of appeals. Today, this Court grants Francis's petition for writ of mandamus.

## II. Jurisdiction and Standard of Review

Typically, jurisdiction over an order granting or denying a temporary injunction is final in the court of appeals. TEX. GOV'T CODE § 22.225(b)(4); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 202 (Tex. 2002). However, if a case demonstrates the need for an expeditious decision because even an expedited appeal could not be completed before the issue became moot or was otherwise inadequate, this Court may review the temporary injunction on a petition by writ of mandamus. *See Republican Party of Tex. v. Dietz*, 940 S.W.2d 86, 93–94 (Tex.1997); *Sears v. Bayoud*, 786 S.W.2d 248, 249–50 (Tex. 1990). In addition, section 273.061 of the Texas Election Code grants the Court jurisdiction to issue a writ of mandamus to compel the performance of any duty imposed by law in connection with the holding of an election. *Sears*, 786 S.W.2d at 249.

To be entitled to mandamus relief, a relator must show that the trial court clearly abused its discretion and that the relator has no adequate remedy by appeal. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135–36 (Tex.2004) (citing *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex.1992)). A trial court's failure to analyze or apply the law correctly constitutes an abuse of discretion. *In re Kuntz*, 124 S.W.3d 179, 181 (Tex.2003).

## III. Probable Right of Recovery

Francis argues the trial court abused its discretion by concluding that Keel established a probable right of recovery. In his original petition, application for temporary restraining order, and application for temporary injunction, Keel asked the trial court to enjoin Republican Party officials from including Francis's name on the Republican Party primary election ballot because Francis failed to comply with sections 172.027 and 172.021(g) of the Texas Election Code. Specifically, Keel alleged that Francis failed to collect the required number of valid signatures (fifty) from registered voters in the Twelfth Court of Appeals District. Of the 122 signatures from the Twelfth District in Francis's petition, 95 signatures were on pages that did not specify that Francis was running for Place 8 of the Court of Criminal Appeals. Instead, those pages noted only that Francis was running for the Court of Criminal Appeals. Francis contends that the omission of the place number does not invalidate the signatures because the omission does not violate the Code's purpose and that this construction of the statute pro-

duces a "just and reasonable result" in accordance with the Code Construction Act. TEX. ELEC. CODE § 1.003(a); TEX. GOV'T CODE § .311.021(3).

When construing a statute, the primary objective is to ascertain and give effect to the Legislature's intent. *Tex. Dep't of Transp. v. City of Sunset Valley,* 146 S.W.3d 637, 642 (Tex.2004) (citing *McIntyre v. Ramirez,* 109 S.W.3d 741, 745 (Tex. 2003)). In discerning that intent, courts begin with the " 'plain and common meaning of the statute's words.' " *City of Sunset Valley,* .146 S.W.3d at 642 (quoting *McIntyre,* 109 S.W.3d at 745). Even if the statute is unambiguous on its face, courts can consider other factors to determine the Legislature's intent, including the object sought to be obtained, the circumstances of the statute's enactment, the legislative history, the common law or former statutory provisions, and the consequences of a particular construction. TEX. GOV'T CODE § 311.023; *Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 493 (Tex.2001); *see also City of Sunset Valley,* 146 S.W.3d at 642. Courts should give full effect to all of a statute's terms. *St. Luke's Episcopal Hosp. v. Agbor,* 952 S.W.2d 503, 505 (Tex. 1997).

Statutory requirements concerning candidacy for elective office are mandatory and are to be strictly enforced. *Wallace v. Howell,* 707 S.W.2d 876, 877 (Tex.1986). And of course, the candidate bears the ultimate responsibility for his or her application and petition for office. *In re Gamble,* 71 S.W.3d 313, 317–18 (Tex.2002). Nevertheless, this Court has also suggested that in limited circumstances, equitable

relief may be available to cure defects in a candidate's application and petition, even when those defects result from the candidate's own mistakes. *Id.* at 318. Although we, presume·that the Legislature intends a just and reasonable result in enacting the requirements in the Election Code, TEX. GOV'T CODE § 311.021(3); *In re Bell,* 91 S.W.3d 784, 785 (Tex.2002), the Court has recognized that the election schedule itself. is the product of careful planning by the Legislature, and extending a statutory deadline is an "extraordinary departure not to be invoked lightly." *In re Gamble,* 71 S.W.3d at 318.[1] The following provisions define. the part of the legis-. lative scheme relevant to this case.

To be entitled to a place on the primary election ballot for a seat on the Court of Criminal Appeals, subsection 172.021(g) of the Texas Election Code requires a candidate to file a petition that complies with subsection 172.021(b). If the · candidate chooses to pay the filing fee established by section 172.024, the candidate's application must be accompanied by a petition with at least fifty valid signatures from each court of appeals district. *Id.*[2] Subsection 172.021(b) also incorporates the requirements from sections 141.031 and 141.062, which provide the. general requirements for an application and petition for a place on the ballot of a general election, into the requirements for an application and petition for a place on the primary ballot. *Id.* § 172.021(b). Section 141.062 states that to be valid, a petition must (1) be timely filed, (2) contain the proper number of valid signatures, and (3) comply with any other applicable requirements prescribed

---

**1.** In fact, the Legislature limited the period within which a signer can withdraw a signature to no later than the seventh day before the filing deadline. TEX. ELEC. CODE .§ 141.067(c)(2). The statute then allows for only a three-day cure period, ensuring that

the petition is finalized before the statutory petition filing deadline. *Id.* § 141.067(g).

**2.** If a candidate chooses not to pay the filing fee, the petition must contain 5,000 valid signatures. TEX. ELEC. CODE § 172.025.

by the Code. Section 141.063 details the specifications of a valid petition signature, and imports the requirements of section 172.027. *Id.* § 141.063(a)(5). Section 172.027 contains one of these other applicable requirements:

The following statement must appear at the top of each page of a petition to be filed under Section 172.021 [as part of an application for a place on the general primary election ballot]: "I know that the purpose of this petition is to entitle *(insert candidate's name)* to have his or her name placed on the ballot for the office of *(insert office title, including any place number or other distinguishing number)* for the *(insert political party's name)* primary election. I understand that by signing this petition I become ineligible to vote in a primary election or participate in a convention of another party, including a party not holding a primary election, during the voting year in which this primary election is held."

The parties agree that twelve pages of Francis's petition do not indicate for which place on the Court of Criminal Appeals Francis is running. Because the plain language of the statute requires the "office title, including any place number or other distinguishing number" to appear at the top of each page of the petition, the signatures on those pages do not meet the validity requirements of sections 172.021(b), 141.031, and 172.027. Because ninety-five of the 122 signatures gathered in the Twelfth Court of Appeals District are on pages lacking the place number, Francis's petition falls short of the fifty required signatures from each district. *See id.* § 172.021(g). The Court concedes this point. However, Francis argues that the equities balance in his favor to either extend the deadline to collect valid signatures or to excuse his noncompliance. He requests the Court to vacate the trial court's temporary injunction so he can be placed on the general primary ballot, or in the alternative, order the Republican Party to place him on the ballot.

Election contests often raise competing interests: courts must favor candidate eligibility and access to the ballot, strictly enforce the Legislature's intent as expressed in the plain words of a statute, and attempt to honor both principles to reach a just and reasonable result as required by the Code Construction Act. *See Davis v. Taylor,* 930 S.W.2d 581, 583 (Tex.1996). Mandatory requirements in the Election Code can work harsh consequences that may result in applicants not being placed on the ballot; yet the plain language of the Election Code, frequently couched in terms of "must" and "shall," instructs that candidates include all of the listed elements in their applications and petitions. *See, e.g.,* TEX. ELEC. CODE §§ 141.031, 141.062, 172.021, 172.027. Presented with the tension among these principles, I would focus on the Legislative intent and determine whether not strictly enforcing the specific requirement at issue would impair the purpose of the statute. This is consistent with the Court's approach in *In re Bell.* 91 S.W.3d 784 (Tex.2002). In that case, the Court concluded the omission of a signer's city on a petition does not invalidate the signature if the signer provides enough information to allow verification of the signer's voting eligibility. *Id.* at 787. The statute required inclusion of the signer's city of residence; however, inclusion of the zip code and state allowed voting eligibility to be verified without identification of the signer's city of residence. *Id.* at 788. The Court reasoned that this analysis furthered one of the principal purposes behind the Election Code—preventing election fraud—while producing a "just and reasonable result." *Id.* at 787 (citing TEX. GOV'T CODE § 311.021(3)); *see*

*also* SENATE COMM. ON STATE AF-FAIRS, BILL ANALYSIS, Tex. H.B. 331, 75th Leg., R.S. (1997); HOUSE COMM. ON ELECTIONS, BILL ANALYSIS, Tex. H.B. 331, 75th Leg., R.S. (1997).

Election fraud could occur when a candidate obtains signatures without the place designation and then, after perceiving another race as less difficult, add that place number to the signed petition at the eleventh hour. To avoid such fraud, the Election Code requires a candidate to include the place number on each page of the petition.[3] TEX. ELEC. CODE § 172.027.

Less nefarious than election fraud, but no less important, is the objective of avoiding voter confusion. Omitting the place number designation on the petition page could mislead a voter into signing one candidate's petition in a race while supporting another candidate in the same race. Because the Election Code prohibits a voter from signing the petition of more than one candidate for the same office in the same election, a misinformed voter signing a petition for a candidate (who omits the place number on the petition) would be prohibited from later signing the petition of the candidate she intended to support. *See id.* § 141.066(a). To ensure that voters are informed, the Legislature has even required this prohibition be stated at the top of each page of the petition. *Id.* § 141.066(b). If a voter does in fact sign the petition of more than one candidate for the same office, the Code invalidates the subsequent signature or signatures. *See id.* § 141.066(c). Although chapter 141 does provide for potential withdrawal of a previous petition signature, the process is somewhat complex. *See id.* § 141.067. Thus a voter who was initially confused by a candidate's omission of the place designation on the petition page would bear the burden of withdrawing his signature if he wanted to sign a petition supporting a different candidate for the same place. Such a result would misapply the provisions of the Election Code by shifting the burden to comply with the Code from the candidate to the voter. *See In re Gamble,* 71 S.W.3d at 318 (candidate has duty to file compliant application by filing deadline); *Brown v. Walker,* 377 S.W.2d 630, 632 (Tex.1964) (orig.proceeding) (candidate charged with knowledge of Election Code provisions).

Voter confusion concerning place designation also risks penalizing candidates who have complied with all of the statutory requirements. The likelihood of voters signing petitions for more than one candidate in the same race is increased when a candidate neglects to state the place number designation. Since subsequent signatures are invalid under subsection 141.066(c), a candidate who complied with the statutory prerequisites, including designation of the place number on the petition page, could lose signatures assumed to be valid based on earlier voter signatures on the petition page of a candidate who failed to put the place number designation on his petition. If a significant number of signatures are lost and not discovered in time, the candidate otherwise in compliance could fail to have enough signatures on her petition to be placed on the primary ballot. This repercussion of voter confusion is serious and shifts the burden of acquiring more signatures to the candidate in full compliance with the requirement rather than the candidate who omitted the place designations. Omitting the place number frustrates the purpose of the statute.

The Court terms Francis's omission of the place number of the office he seeks a "technical" or "minor mistake[ ]." 186

---

**3.** We note that this case involves no allegations of actual fraud.

S.W.3d at 544. But the Legislature made a policy determination that petition signatories should be aware of the specific position a candidate seeks for policy reasons that even the majority acknowledges. I would not call an omission that creates "the potential for voter confusion or fraud," 186 S.W.3d at 542, a "minor" defect. The Legislature has determined the substantive requirements for a petition, and it is not our place to second-guess that determination. There is nothing "whimsical" about requiring candidates to supply information intended to prevent election fraud and voter confusion within the statutory deadline. But, as I read the Court's opinion, district courts and election officials are authorized to allow candidates to correct defects that "a reasonable review should have discovered" even after the filing deadline. 186 S.W.3d 542–43. Surely the Legislature did not intend to create a system in which mandated deadlines are so lightly discarded.

In cases absent allegations of fraud or similar circumstances—like this one—the four corners of the petition itself will show whether a reasonable signer of the petition could ascertain the name of the potential candidate and the office he sought. Nothing on the twelve pages which omitted the place designation could inform voters of the place on the Court of Criminal Appeals that Francis sought. Accordingly, I would hold Keel established that the Republican Party should have rejected Francis's application, and the trial court did not abuse its discretion in entering the temporary injunction.

### IV. The Party's Duty

Francis argues that because the Code requires the Party to determine an application's compliance with the statute, he was entitled to rely on the Party's initial determination. Therefore, he argues, and

the Court agrees, he is entitled to an opportunity to cure the fatal defects even though the filing deadline passed. But the Election Code provides no remedy or consequence for the Party chair's failure to properly and timely review an application. Instead, subsection 141.032(d) allows the Party chair to reverse a certification decision all the way up to the time early voting begins. TEX. ELEC. CODE § 141.032(d). Thus, under the statute, if a candidate fails to catch objectionable errors in his petition prior to the filing deadline, he risks a challenge and potential reversal of the Party chair's initial certification as late as the day before early voting begins. *Id.* § 141.034(a).

A potential primary election candidate must submit a timely application (and a petition, in some cases) to the proper authority, here the Party, to obtain a place on the ballot. *Id.* §§ 141.062, 172.021. Then the authority "shall review the application to determine whether it complies with the requirements as to form, content, and procedure" no later than the fifth day after the application is received, or as soon as practicable if the application is accompanied by a petition. *Id.* §§ 141.032(a)-(c). If the authority determines that the application does not comply with the applicable requirements, it "shall reject the application and immediately deliver to the candidate written notice of the reason for the rejection." *Id.* § 141.032(e). The statute withholds the finality of this determination until "the day before the beginning of early voting by personal appearance" by permitting challenges and "subsequent determinations" of the application's compliance. *Id.* §§ 141.032(d), 141.034(a). Thus, by the explicit language of the statute, the authority's initial determination "does not preclude a subsequent determination that the application does not comply." *Id.* § 141.032(d). The Code does not provide an extension of time to cure defects if the

challenge or subsequent determination of noncompliance occurs after the filing deadline.

In this case, Francis admits that he filed a noncompliant petition by failing to include the place number on twelve pages of his petition from the Twelfth Court of Appeals District. The parties also agree that Republican Party officials reviewed the petition but did not detect the defect. Thirty minutes before the filing deadline, Keel notified the Party of the defect in Francis's petition. After realizing the defect in the petition, the Party was required to reject the application and notify Francis of the reason for the rejection. *See id.* § 141.032(e). Instead, on Friday, January 6, the Party advised Keel that it intended to certify Francis in spite of Keel's challenge.

Francis contends that this Court's description of party review as a "safety net" in *In re Gamble* essentially made the party a guarantor of an application's compliance. *See* 71 S.W.3d at 318. The Court's opinion, unfortunately, affirms Francis's contention. In *Gamble,* a candidate filed an application listing the position sought as judge of the "190th Civil Dist. Court," but the petitions that accompanied the application identified the position as "District Judge, 270th Judicial District." *Id.* at 315. Gamble obtained a temporary restraining order that had the effect of putting him back on the ballot, and then nonsuited his case. *Id.* at 316. After the nonsuit, his opponent obtained mandamus relief in a separate proceeding at the court of appeals, which ordered Gamble removed from the ballot. *Id.* This Court held that the court of appeals did not abuse its discretion in ordering the Party to remove Gamble from the list of candidates because the trial court's temporary restraining order that put Gamble back on the list had no legal effect after Gamble nonsuited the

case before obtaining a decision on the merits. *Id.* at 319.

This case differs significantly from *Gamble,* and the Court's reliance on it is misplaced. In *Gamble,* we concluded that election officials owe a duty under subsection 141.032(e) of the Election Code to notify candidates of defects in their applications and implied a concomitant opportunity to cure them. *Id.* at 318. The information required on an application form essentially provides election officials with information necessary to determine the office sought by a candidate and the candidate's eligibility for that office, TEX. ELEC. CODE §§ 141.031(1), (4)(A)-(J), and assures that the candidate is aware of the fundamental duty to uphold the law and the statutory prohibition on nepotism. *Id.* §§ 141:031(4)(K), (L). But the omission of information from a *petition* that the Legislature has determined should be conveyed to signatories implicates interests beyond those of the party and the candidate. As I have noted, the requirement that a candidate's petition inform voters of the specific office the candidate seeks prevents signatories from unwittingly precluding themselves from signing another petition for the same office and precludes candidates from engaging in gamesmanship by waiting until the last minute to decide for which place to run. Those broader interests differentiate this case from *Gamble.*

Before deciding the case on the validity of the temporary restraining order, however, the Court summarized some of the duties at issue in an election case. *In re Gamble,* 71 S.W.3d at 318. The Court emphasized that a candidate bears ultimate responsibility for filing a compliant application and petition before the filing deadline, but also noted that "mistakes on an application are not an absolute bar to equitable relief." *Id.* Recognizing that the

Party's review of applications and petitions "serves as a safety net for candidates who file their applications early in the filing period," the Court observed that when fashioning an equitable remedy in an election case a court must balance the application and purpose of the Election Code's requirements. *Id.* The Court warned that extraordinary relief that would function to extend deadlines is "not to be invoked lightly." *Id.*

Only four justices concluded that Judge Gamble's allegations that "the only defect in the application is a clerical one, appearing on its face that Party officials should have noticed and called to his attention well before the filing deadline expired" provided a basis for equitable relief. *Id.* Four others justices concluded that the plain language of the Election Code creates an absolute deadline for filing a compliant application and petition, and that giving a trial court equitable power to disregard this absolute deadline "destroys the legislative intent for a fair and predictable election process." *Id.* at 326 (Baker, J., concurring). I would not alter deadlines set by the Legislature to allow a candidate who—by his own mistake—filed a noncompliant application and petition to correct his application after the deadline because he relied on the Party's review.

The Legislature placed a ministerial duty on party officials to review applications for compliance and to reject those applications not in compliance. However, I do not believe the Legislature intended the Party's review under section 141.032 to undermine its carefully crafted scheme of deadlines. Rather, section 141.032 exists to further the goal of an orderly election process that results in timely elections. The duty created by section 141.032 is owed to the public, not to an individual candidate whose application fails to comply with statutory requirements. Section 141.032 aids in establishing by January 2 a pool of certified candidates, all of whom may be challenged or decertified by the Party until the time for early voting. Though I am sympathetic with the Court's attempt to reach a result that favors the eligibility of candidates, I believe this attempt is too disruptive to the election process designed by the Legislature. Without statutory language to the contrary, Francis was not entitled to rely on the Party's review as insurance against any further challenges to his application and petition.

## V. Unclean Hands

Francis argues that the trial court erred in granting the equitable remedy of a temporary injunction because Keel did not come to the trial court with clean hands. A temporary injunction is an equitable remedy subject to equitable principles like the clean hands doctrine. *See In re Gamble,* 71 S.W.3d at 317; *Truly v. Austin,* 744 S.W.2d 934, 938 (Tex.1988).

The clean hands doctrine requires that one who seeks equity, does equity. Equitable relief is not warranted when the plaintiff has engaged in unlawful or inequitable conduct with regard to the issue in dispute. *Right to Life Advocates, Inc. v. Aaron Women's Clinic,* 737 S.W.2d 564, 571–72 (Tex.App.—Houston [14th Dist.] 1987, writ denied); *Grohn v. Marquardt,* 657 S.W.2d 851, 855 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.) (cited in *Davis v. Grammer,* 750 S.W.2d 766, 768 (Tex. 1988)); *see also Omohundro v. Matthews,* 161 Tex. 367, 341 S.W.2d 401, 410 (1960). Whether a party has come to court with clean hands is a determination left to the discretion of the trial court. *Grohn,* 657 S.W.2d at 855.

Francis argues that Keel acted inequitably in waiting until thirty minutes before the filing deadline to notify Francis and the Republican Party that twelve pages of

Francis's petition lacked a place number. If Keel had acted earlier, Francis claims he would have had time to cure the defects in his petition. Keel responds that his conduct was not inequitable because he had no duty to notify anyone of potential errors, much less at any specific time. Keel uncovered the petition defect four days before the January 2 filing deadline. He immediately notified his attorney, who did not review Francis's petition until after the holiday weekend on Monday, January 1. Keel notified the Party of the defect at 5:30 p.m. on January 2. I would conclude that the trial court did not abuse its discretion in determining that Keel's actions did not prevent him from seeking equitable relief.

The Texas Election Code provides that "[a]n application for a place on the ballot, including an accompanying petition, is public information immediately on its filing." *See* TEX. ELEC. CODE § 141.035. Reviewing these public records is neither an illegal nor inequitable activity. Although reviewing an opponent's petition is common practice among political candidates, it is not a statutorily required practice.

The timing of Keel's objection does not render his actions inequitable. The timing of a challenge to an application's compliance with the Election Code requirements is limited only by section 141.034: an application may be challenged for compliance with the applicable requirements until the day before the beginning of early voting by personal appearance. The statute does not require challenges to be made within a certain time after discovery. Because the law imposed no duty on Keel to inspect the application and petition, nor to disclose any defects he discovered during his inspection, his actions were not such as would prevent the trial court from granting equitable relief.

## VI. Proper Injunction

Francis also claims that the trial court abused its discretion by granting an improper injunction. First, Francis argues that the injunction is improper because the trial court effectively granted Keel all of the requested relief without a trial on the merits. A trial court may not "grant a temporary injunction, the effect of which would be to accomplish the object of the suit. To do so would be to determine rights without a trial." *Tex. Foundries, Inc. v. Int'l Moulders & Foundry Workers' Union*, 151 Tex. 239, 248 S.W.2d 460, 464 (1952). The trial court ordered that Party officers were "TEMPORARILY ENJOINED from placing Francis's name on the ballot for the March 7, 2006 Republican Party primary election" until the merits of the case was heard on Friday, February 3, 2006. Francis argues that between now and the trial date, he will lose his right to effective review of the trial court's decision, presumably because the candidate lists for the ballots will be finalized and the ballots printed. I disagree.

In *Davis v. Taylor*, this Court granted mandamus relief to a candidate who, through no fault of his own, was omitted from the ballot, even though the grant of relief endangered the stability of the election schedule. 930 S.W.2d 581, 583 (Tex. 1996). Likewise, in *LaRouche v. Hannah*, the Court noted that "[t]he fact that the printing of ballots has begun does not extinguish LaRouche's right to appear on those ballots." 822 S.W.2d 632, 633 (Tex. 1992). Understandably, courts are hesitant to disturb the election schedule absent the possibility of grave injustice, and we have done so only on rare occasions to favor the policy of access to the ballots in the public interest. *Id.; Painter v. Shaner*, 667 S.W.2d 123, 125 (Tex.1984). The availability of review and relief upon a proper showing—even after ballots have

been printed—demonstrates that Francis's access to meaningful review is not eliminated by the trial court's grant of the temporary injunction. The trial court did not effectively grant Keel all of the requested relief in a temporary injunction without a trial on the merits.

"A temporary injunction's purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits." *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex.2002). The trial court's order reflects the uncertainty of some facts in the record regarding whether Francis was actually certified, frustrating the trial court's ability to determine the status quo regarding certification. The trial court enjoined Party officials from certifying Francis while also ordering those officials to take "whatever actions are necessary to decertify Francis to the extent he was conditionally certified previously." At oral argument before this Court, the parties continued to disagree as to whether Francis was certified, conditionally certified, or not certified. However, the trial court's order contained a third part that enjoined Party officials from placing Francis's name on the ballot for the March Republican Party primary. There is no dispute that at the time of the injunction, the ballots were not yet prepared. Therefore, with regard to the inclusion of Francis on the actual ballot, the trial court's order did not disturb the status quo.

## VII. Conclusion

In this case, not enforcing the requirement that the place designation be included on the petition at the time voters sign it would contravene express requirements and impair the purpose of the Election Code. Because I would conclude that the trial court did not abuse its discretion in enjoining the Republican Party State Chair from placing Francis's name on the general primary ballot, I dissent.

